THEODORE W. LIBBEY, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Libbey v. Commissioner
Docket No. 14831-87.
United States Tax Court
T.C. Memo 1988-254; 1988 Tax Ct. Memo LEXIS 279; 55 T.C.M. (CCH) 1052; T.C.M. (RIA) 88254; June 7, 1988. John P. Warner, for the petitioner. Karen A. Rose, for the respondent. BUCKLEY
MEMORANDUM FINDINGS OF FACT AND OPINION BUCKLEY, Special Trial Judge: This case was hear pursuant to the provisions of section 7443A(b) of the Internal Revenue Code of 1986 and Rules *280 180,181, and 182. [1]
Respondent determined a deficiency in petitioner's Federal income tax in the amount of $ 1,138 for the taxable year 1982. [2] The issue for decision is whether the expenses for meals, lodging, and transportation incurred by petitioner in New York City where he was employed were incurred while he was traveling "away from home" within the meaning of section 162(a)(2). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in New York, New York, at the time he filed his petition herein. He filed his Federal income tax return for 1982 with the Internal Revenue Service Center at Philadelphia, Pennsylvania. Petitioner *281 was born in Washington, D.C., and grew up in the Washington, D.C.-Baltimore, Maryland area. He studied European history, culture, music and literature at Yale University in New Haven, Connecticut. Upon graduation in 1973 he returned to Washington, D.C., and worked for the U.S. Department of Defense. The following year he ran the composer-librettist program in the Music Section of the National Endowment for the Arts. In 1976 petitioner enrolled in the Ph.D. program for music history and literature at Stanford University in Palo Alto, California. When he had completed all of the requirements for his doctorate, except his thesis, he returned to Washington, D.C., in the summer of 1978 and worked part-time as a critic for the Washington Star. At the end of the summer he was hired as the only full-time music critic of the Washington Star, the position he held until August 1981 when the newspaper ceased publication. Petitioner was given 2 weeks notice of the paper's closing and began immediately to look for other employment in the Washington, D.C. area. He had developed numerous friends and contacts in the cultural community in the normal course of attending and reviewing performances *282 and writing about the funding, labor disputes and social aspects of the cultural life of the city. He contacted and spoke with people at the Kennedy Center for the Performing Arts, the University of Maryland, the Smithsonian Institution, and the National Symphony Orchestra; also, publications such as the Washington Post and the Washingtonian magazine. Petitioner concentrated his efforts solely on the Washington, D.C. area, but by late summer nothing had materialized. It was at this time that petitioner was contacted by a friend who told him there was a vacancy at the New York Times and, knowing he was unemployed, suggested he send a resume. In early October 1981 petitioner met with the deputy assistant managing editor and the senior music critic of the Times who told him there was a non-staff position available for 2 or 3 months which entailed reviewing concerts. Nothing was said to indicate that petitioner would ever be given a permanent staff position. The particular position of free-lance classical music critic was viewed by the paper as an opportunity for a promising young critic to develop a relationship with the New York Times which might or might not lead to something *283 permanent. Petitioner was recognized as a distinguished critic who had done an outstanding job for the Washington Star, and the times was anxious to get a closer look at his work. Petitioner accepted the position because he needed the money and believed writing for the paper would enhance his professional reputation. He also felt it would be easier to leave such a non-staff position if a permanent position became available in Washington, D.C. Petitioner began working for the New York Times in October 1981. He had no employment contract or agreement and was not provided with health or life insurance or any other fringe benefit. He was not a member of the collective bargaining unit of the employees of the paper and had no severance or grievance rights. He had no assigned work space, desk, word processor or phone. He had to use what was available when it was available on a catch-as-catch-can basis. Petitioner was not paid a salary and was not guaranteed any minimum compensation. He did not know from one week to the next what or how many assignments he would be given, or, in fact, whether he would have any assignments. He was paid by the "piece," ranging from $ 50 for a short *284 news piece to $ 250 for a feature article in the Sunday "Arts and Leisure" section. He was paid $ 75 for a concert review and $ 125 for a feature item in the Friday "Weekend" section. The work was seasonal in the sense that there were many more performances and cultural events between October and May than in the summer months. Petitioner worked more than 40 hours per week, especially during the winter months when he sometimes attended 10 concerts a week and earned $ 1,200 to $ 1,400 weekly. During the summer, however, he was only assigned an average of one concert per week, and earned from $ 150 to $ 200 a week. Even though he was in a non-staff position, the Times did not allow petitioner to have any outside employment while he was writing for the paper; nor could he write for other publications. Toward the end of 1981, after working for the New York Times for 3 months, petitioner sought a clarification of his status from Don Henahan, the senior music critic. He was told that the Culture Department was in the process of being reorganized and that it was difficult to foresee what the results would be. Mr. Henahan suggested that petitioner continue for another 2 or 3 months, *285 but nothing was said about the quality of petitioner's work or what would happen at the end of the 2 or 3 month period. Again in April 1982 petitioner sought clarification of his status. As the reorganization process was still underway and not to be completed before June or July, he was not able to learn anything about his future with the paper. The reorganization resulted in organizational and personnel changes which went into effect in July 1982. William Honan became the Cultural News Editor and brought the three separate entities which formerly made up the Culture Department together into a single unit. He became the person with authority over petitioner's work. He had high regard for petitioner both personally and professionally. He met with petitioner and discussed and critiqued his work but did not change petitioner's status with the newspaper, nor did he tell petitioner he would have a permanent position. In July 1982 petitioner became ill. Because of continuing symptoms, he returned to Washington, D.C., for diagnosis, tests, treatment and rest. Around September he requested a leave of absence from the paper from Mr. Honan. He was told he could take as long as *286 he needed but there was no guarantee the position would be open if and when he returned. This leave was necessarily without pay, since petitioner was paid only for each article or piece he wrote. In December 1982 petitioner felt well enough to return to work. He called the Times and was informed that his position had been filled and he was no longer needed. At the time he accepted the position at the Times, petitioner had been living for approximately one year in an apartment he shared with his girlfriend and a third person who lived in a separate section of the apartment. Under an informal cost-sharing arrangement, he paid roughly one-third of the total household expenses. This arrangement continued while petitioner was working in New York. Petitioner returned to Washington, D.C., whenever he had a free day, usually three or four times a month. He continuously looked for employment in Washington, D.C., keeping in tough with his friends and contacts and following up on possible openings. He did not look for permanent employment in New York. Petitioner began working for the Times on short notice. It was difficult to find a suitable apartment at an affordable price with *287 a short-term lease. He signed a 1-year lease on a one bedroom apartment for $ 975 a month. He bought a bed, a couple of chairs, and shelves for the apartment, and moved from his Washington, D.C. apartment only his clothing, stereo, and reference books and recordings. Petitioner had no family or close friends in New York. With the exception of his girlfriend who frequently visited on weekends, petitioner did no entertaining at his New York apartment. In effect, he "camped-out" in the apartment. When he was told in December of 1982 that his position at the Times had been filled, petitioner remained in Washington, D.C. He did free-lance writing for various publications and reviews and commentary for National Public Radio. He continued to seek permanent employment in Washington, D.C. In December 1983, the editor of Musical America magazine called petitioner had informed him of an opening in New York City as editor of classical music for High Fidelity magazine. Petitioner was hired for the position and began working for the magazine in March 1984. For the 1982 taxable year petitioner claimed a deduction of $ 17,154.78 for rent, meals and travel expenses relating to his employment *288 in New York City. Respondent disallowed the deduction in its entirety on the grounds that petitioner was not "away from home" within the meaning of section 162(a)(2) while he was working in New York City. OPINION We must decide whether petitioner is entitled to deduct the expenses he incurred during 1982 while working in New York City. Respondent's determination in the notice of deficiency are presumed correct and petitioner bears the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Generally, section 262 disallows any deduction for personal, living, or family expenses. Section 162(a)(2), however, allows a taxpayer to deduct expenses for meals, lodging, and transportation incurred while away from home in pursuit of a trade or business. The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Kroll v. Commissioner,49 T.C. 557, 562 (1968). In order to deduct these expenses, *289 however, the traveling must be required by the exigencies of the taxpayer's employment rather than by his "personal conveniences and necessities." Commissioner v. Flowers,326 U.S. 465, 474 (1946). Generally, a taxpayer's home for purposes of section 162(a)(2) is the location of his principal place of business or employment. Mitchell v. Commissioner,74 T.C. 578, 581 (1980). Where a taxpayer with a principal place of employment goes elsewhere to do work which is temporary, his "home" for purposes of section 162(a)(2) remains the vicinity of his principal place of employment since it would not be reasonable to expect him to move his residence under such circumstances. Peurifoy v. Commissioner,358 U.S. 59, 60 (1958). On the other hand, if the taxpayer accepts indefinite employment outside the vicinity in which he lives but chooses not to change his residence, the additional living costs result not from the exigencies of his employment but from the "personal convenience and necessities" of the taxpayer and are not deductible. Sec. 262; Commissioner v. Flowers, supra.
For this purpose, "temporary" employment is *290 a type which can be expected to last for a short period of time. Tucker v. Commissioner,55 T.C. 783, 786 (1971). However, even if it is known that a particular job will terminate at some future date, that job is not temporary if it is expected to last for a substantial or indefinite period of time. Jones v. Commissioner,54 T.C. 734 (1970), affd. 444 F.2d 508 (5th Cir. 1971); Norwood v. Commissioner,66 T.C. 467 (1976). Furthermore, temporary employment may become indefinite due to changed circumstances or merely the passage of time. Norwood v. Commissioner, supra;Garlock v. Commissioner,34 T.C. 611 (1960). Whether a taxpayer's employment is temporary or indefinite is a question of fact. Peurifoy v. Commissioner, supra."No single element is determinative of the ultimate factual issue of temporariness, and there are no rules of thumb, durational or otherwise." Norwood v. Commissioner, supra at 470. The ultimate question is whether the nature of the position in which a taxpayer is employed is such that he could reasonably have been expected to move *291 his residence. Tucker v. Commissioner, supra at 786. Respondent admits that when petitioner was first "hired" for 2 or 3 months, his employment was temporary. However, respondent contends that it became indefinite when it was informally extended in December 1981. Respondent argues that the mere fact of a 2 to 3 month extension made it reasonable for petitioner to believe that his work was considered satisfactory and that, as long as it remained so, he could continue in the job indefinitely. The facts belie this argument. The extension was made at a time of uncertainty in the Culture Department and in anticipation of the completion of the reorganization. The second extension was granted in the same circumstances. It would have been reasonable for petitioner to assume that his employment could be terminated as soon as the impending reorganization was completed. Respondent also argues that although petitioner was only in New York City for 10 months, he was actually employed by the New York Times for 14 months, and that it is reasonable to believe that had petitioner not chosen to leave New York because of his illness, he could have continued to work for the *292 New York Times beyond December 1982. This argument distorts the reality of the facts as presented in order to subject them to analysis under Rev. Rul. 60-189, 1960-1 C.B. 60. Implicit in the argument is the application of the revenue ruling that the allowance off a deduction in temporary-indefinite cases would be limited to situations where both the expectation and actual duration of the work is less than 1 year. The revenue ruling was amplified by Rev. Rul. 83-82, 1983-1 C.B. 45,46, which creates a presumption that employment is indefinite rather than temporary where the taxpayer anticipates employment to last for 1 year or more and the employment does, in fact, last for 1 year or more. While respondent's 1-year rule may provide a useful rule of thumb for his own purposes, we must look at all the facts and circumstances and are not bound by such a mechanical test. See Basden v. Commissioner,T.C. Memo. 1978-232. We believe that for all intents and purposes, when petitioner first became ill in July and then went on "leave of absence" in September 1982 he was no longer employed. He was not reviewing concerts or writing feature articles *293 and, therefore, he was not being paid anything by the New York Times. The exigencies of the business did not allow Mr. Honan to guarantee petitioner that the position would be available when he recovered. In fact, petitioner's position was given to another person shortly after petitioner requested the leave of absence. Based on the totality of the evidence before us, we find that petitioner's employment in New York City during 1982 was temporary and that Washington, D.C., was his tax home. Petitioner had no reason to believe that his position would be other than temporary. He was hired to review concerts for 2 or 3 months. Little was said beyond this. The conditions under which he worked, and the fact that he was a non-staff, non-salaried employee underscore the temporary nature of the position. Shortly after he began working, the only available staff position was filled. Shortly after that, discussions began on the reorganization of the Culture Department. For the duration of his time at the paper, no staff positions opened up and no assurances could be given or assumptions made because of the uncertainty of the outcome of the reorganization process. Twice petitioner tried *294 to clarify the status of his employment, and neither time was he given any reason to believe that his job would go on indefinitely. On both occasions, petitioner's position was informally extended for 2, 3, or 4 months, pending the completion of the reorganization. The evidence shows that petitioner considered his position at the New York Times as a temporary means of earning money and boosting his professional recognition while he continued to search for employment in Washington, D.C. Throughout his stay in New York petitioner maintained his personal and employment contacts and continued his job search in the Washington, D.C. area. His goal of finding such employment was entirely realistic. Through education and experience petitioner had developed an expertise in his profession, and the Washington, D.C. area is replete with organizations, institutions, programs and publications devoted to the arts and humanities and other cultural pursuits. Respondent makes much of the fact that petitioner signed a 1-year lease. However, that had more to do with the housing market in New York City than with the expected duration of petitioner's job. He felt assured that if the opportunity *295 arose for his return to Washington, D.C., the apartment would be reoccupied very shortly thereafter, and the most he would lose was his security deposit. The apartment, itself, was sparsely furnished. Petitioner only moved a bare minimum of his possessions such as clothing and work-related reference books and recordings. Petitioner did not register to vote in New York or change his driver's license. He returned to his apartment in Washington, D.C., whenever he had a free day. His parents lived in the Washington, D.C., area, and he had been involved in the cultural life of the city for many years. Petitioner could not reasonably have been expected to relinquish the living arrangement he had established in Washington, D.C., and set up a new residence in New York, given the nature and condition of his employment there. Although no one of the above-mentioned facts we have considered is determinative of the ultimate factual issue of temporariness, we believe that the facts taken in concert point to a conclusion that petitioner's employment in New York City was temporary. Cf. and compare Norwood v. Commissioner,66 T.C. 467, 470 (1976). Since petitioner's tax *296 home remained in Washington, D.C. during the taxable year in issue the expenses incurred by working in New York City were incurred while "away from home" within the meaning of section 162(a)(2). Accordingly, they are deductible. Decision will be entered for the petitioner.
Footnotes
1. All subsequent section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Deductions for medical and dental expenses and for general sales tax are contingent upon petitioner's adjusted gross income, which will depend upon the outcome of this case. ↩